'09 CIV 7483

RECEIVED
AUG 26 2009
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DEIULEMAR SHIPPING SPA,

                                     Plaintiff,

-v-

OCEANVAST INTERNATIONAL CO. LTD.,

                                     Defendant.
-------------------------------------------------------------x

09 CV

**VERIFIED COMPLAINT**

Plaintiff, DEIULEMAR SHIPPING SPA (hereinafter "DEIULEMAR"), by its attorneys, CHALOS & CO, P.C., as and for its Verified Complaint against Defendant, OCEANVAST INTERNATIONAL CO. LTD., (hereinafter "OCEANVAST"), alleges upon information and belief as follows:

### JURISDICTION

1.      The Court has subject matter jurisdiction by virtue that the underlying claim herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28 U.S.C. § 1333.

### THE PARTIES

2.      At all times material hereto, Plaintiff, DEIULEMAR, was and still is a foreign business entity with a principal place of business at Torre Del Greco, Naples, Italy.

3.      At all times material hereto, Defendant, OCEANVAST, was and still is a foreign business entity with a principal place of business at Room A2204-2205, China Shine Plaza, No. 9 Lin He Xi Road, Tianhe Guagzhou, 510610, The People's Republic of China.

Chalos & Co ref: 2012.011

<u>FACTS AND CLAIM</u>

4.      On or about June 2, 2009, Plaintiff DEIULEMAR, as owners of the M/V GIOVANNI DELLA GATTA, and Defendant, OCEANVAST, as charterers, entered into one (1) time charter party agreement for the carriage of iron ore from Geraldton, West Australia to Jingtang, China. *A copy of the charter party agreement is annexed hereto as Exhibit 1.*

5.      This charter party agreement is a maritime contract.

6.      Pursuant to the terms and conditions of the charter party agreement, DEIULEMAR and OCEANVAST agreed to the arbitration of disputes arising out of the maritime contract in London with English law to apply.

7.      The charter party further provided for the payment of hire at the rate of USD 18,000.00, per day pro rata.

8.      The vessel completed discharge of the cargo in Jingtang, China on or about August 18, 2009 and was subsequently redelivered to Plaintiff, DEIULEMAR.

9.      In breach of the terms of the charter party agreement, Defendant has failed to pay the full amount of hire due and owing to the Plaintiff and has an outstanding balance of USD 158,051.89.  On or about August 19, 2008, DEIULEMAR sent a final Hire Statement to Defendant OCEANVAST with a summary of the hire which remains due and payable.  *See Hire Balance Request annexed hereto as Exhibit 2.*

10.      Despite demands by DEIULEMAR to Defendant OCEANVAST to pay the outstanding sum in a timely manner, OCEANVAST, in breach of the terms of the June 2, 2009 charter party agreement, has failed, neglected, and/or otherwise refused to pay Plaintiff.

11.     As a result of Defendant's failure to fulfill its obligations in accordance with the terms of the charter party agreement, Plaintiff DEIULEMAR has sustained principal damages in the total amount of USD 158,051.89.

12.     Pursuant to the terms of the charter party agreement, all disputes arising there under are to be submitted to London arbitration with English law to apply.  Plaintiff DEIULEMAR will commence arbitration after the commencement of this action and jurisdiction is obtained over Defendant.

13.     This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiff's claims and in aid of the London arbitration.

14.     English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

15.     As best as can now be estimated, Plaintiff DEIULEMAR expects to recover the following amounts in arbitration from Defendant OCEANVAST:

| | | |
|---|---|---|
| A. | Principal claim: | *$ 158,051.89* |
| B. | Estimated interest on Principal claim: 3 years at 7.5%, compounded quarterly | *$ 39,468.15* |
| C. | Estimated Attorneys' fees/ Arbitration costs: | *$ 65,000.00* |
| | **Total Claim** | **$ 262,520.04** |

16.     Therefore, DEIULEMAR'S total claim for breach of the maritime contract against Defendant OCEANVAST is in the aggregate USD 262,520.04.

## BASIS FOR ATTACHMENT

17.    Defendant OCEANVAST cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendant is believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendant within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

18.    Defendant OCEANVAST is engaged in international commerce, ships its products all over the world, and conducts business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City.  U.S. Dollars are the *lingua franca* of international commerce.

19.    All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

20.    Defendant OCEANVAST has previously remitted payment in U.S. Dollars from the Hong Kong Branch of HSBC Bank.  HSBC Bank N.A. is a member of the CHIPS network.  *See a copy of the Hire Remittance Invoice annexed hereto as Exhibit 3.*

21.    Plaintiff believes that some of these assets of the Defendant, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the Defendant;

effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendant and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, State Bank of India, UBS AG, U.S. Bank, Wachovia Bank, and Wells Fargo Bank.

WHEREFORE, Plaintiff prays:

A.      That process in due form of law issue against the Defendant, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.      That since the Defendant cannot be found within the District, as set forth in the Declaration of George M. Chalos *(a copy of which is annexed hereto as Exhibit 4)*, and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendant's tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendant, up to the amount of **USD 262,520.04** to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and

pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the

Complaint;

      C.     That Plaintiff may have such other, further and different relief as may be

just and proper.

Dated: Oyster Bay, New York
       August 26, 2009

                      CHALOS & CO, P.C.
                      Attorneys for Plaintiff
                      DEIULEMAR SHIPPING SPA

By:      _____

                      George M. Chalos (GC-8693)
                      123 South Street
                      Oyster Bay, New York 11771
                      Tel: (516) 714-4300
                      Fax: (516) 750-9051
                      Email: gmc@chaloslaw.com

Exhibit 1

# Time Charter
## GOVERNMENT FORM
### Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   This Charter Party, made and concluded in *Singapore*, ..................................... *2nd day of June 2009* .................. 19.......

2   Between Messrs. *Delulemar Shipping SpA a socio unico, Torre del Greco, Naples, Italy* ...........................................................

3   Owners of the good *Italian flag* .... Steamship/Motorship *"GIOVANNI DELLA GATTA" (See Clause 52 for full vessel's description)* ....

4   of ................ tons gross register, and ........................ tons net register, having engines of ................... indicated horse-power

5   with hull, machinery and equipment in a thoroughly efficient state, and classed ..............................................................................

6   at ............ of about ........ cubic feet bale capacity, and about ............................................. tons of 2240 lbs.

7   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8   allowing a minimum of fifty tons) on a draft of .............. feet ............... inches on ................... Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about ........................................... tons of fuel and capable of steaming, fully laden, under good weather

10   conditions about ........................... knots on a consumption of about .................... tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,

11   now ....................................................................................................................................................................................

12   and *Oceanvast International Co. Ltd* Charterers of the City of *Room A2204-2205, China Shine Plaza, No. 9 Liu He Xi Road, Tianhe,*
    *Guangzhou 510610, The People's Republic of China.*

13   **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14   about *one timecharter trip via West Australia with Iron Ore in bulk to full China via safe port(s), safe berth(s), safe anchorage(s)*

15   *always afloat always within Institute Warranty Limits,* ................................................ within below mentioned trading limits.

16   Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17   the fulfillment of this Charter Party.

18   Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot one safe port Hong Kong any time day or night,*
    *Sundays and holidays included* ........................................................

19   ...............................................................................................................................................................................................

20   in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6) as

21   the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery *arrival at first*
    *load port after delivery* to be

22   ready to receive *Charterers intended* cargo with clean-swept holds *(See Clause No. 31)* and tight, staunch, strong and in every way fitted for the service,
    having water ballast, winches and

23   donkey-boiler with sufficient steam power, or if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same

24   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25   dise, including petroleum or its products in proper containers, excluding *(See Clause No. 55)* ........................................................

26   (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27   all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28   America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29   Mexico, and/or South America ...................................................................................................................................... and/or Europe

30   and/or Africa, and/or Asia, and/or Australasia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31   October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

32   *Within Institute Warranty Limits (See Clause No. 35) excluding (See Clause No. 41) via safe berth(s), safe port(s), safe*

33   *anchorage(s), always afloat, always accessible* .....................................................................................................................

34   ...............................................................................................................................................................................................

35   as the Charterers or their Agents shall direct, on the following conditions:

36   1.   That the Owners shall provide and pay for all provisions, wages, *Immigration* and consular shipping and discharging fees of the Crew; shall pay for

37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39   2.   That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions,

40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43   charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44   of six months or more.

45   Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47   for dunnage, they making good any damage thereto.

48   3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49   board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ................. tons and not more than

50   ................ tons and to be re-delivered with not less than ................. tons and not more than ............ tons. *(As per Clause No. 30)*

51   4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD20,000 (Twenty Thousand dollars) daily or pro*

52   *rata including overtime, First hire with value of estimated bunker consumption to be paid within three(3) banking days after*
    *vessel's delivery. Thereafter hire to be paid every fifteen days in advance* in United States Currency per ton on vessel's total deadweight
    carrying-capacity including bunkers and

53   stores, on ................................................. summer freeboard, per Calendar Month commencing on and from the day of her delivery, as aforesaid, and at

54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) *on dropping last outward sea pilot one safe port China any time day or night,*
    *Sundays and holidays included,* ....................................................................................................................................................................
56  ........................................................................................ unless otherwise mutually agreed. Charterers are to give Owners not less than *10/7* days
57  notice of vessels expected date of re-delivery, *and port* and probable port *5/3/2/1 day(s) definite notice of redelivery.*
58  6.  Payment of said hire to be made in New-York *(See Clause No. 78)* in cash in United States Currency, semi-monthly *every 15 days* in advance,
    and for the last *15 days* half-month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise falling the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once, such time used to count as hire.
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, to the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70  lie aground.
71  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow. Charterers
74  paying Owners........................................... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers.*
76  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim *and discharging, lash, secure, dunnage* the cargo at their expense under the supervision of the
    Captain, who is to sign Bills of Lading for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments. *(See Clause No. 56).*
82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling, *(See Clause No. 64).*
86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs *in English*, showing the course of the vessel and distance run and the con-
89  sumption of fuel.
90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13.  That the Charterers shall have the option of continuing this charter for a further period of ................................................................................................................
92  ........................................................................................................................................................................................................................................................
93  on giving written notice thereof to the Owners or their Agents .......................................... days previous to the expiration of the first-named term, or any declared option.
94  14.  That if required by Charterers, time not to commence before *3rd June 2009* ............................................... and should vessel
95  not have given written notice of readiness on or before *7th June 2009* ............................................... but not later than 4 p.m. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  15.  That in the event of the loss of time from deficiency *and/or default* of men or stores, *strike of officer and/or crew*, fire, breakdown or
    damages to hull, machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all *directly incurred* extra expenses shall be deducted from the hire.
102 16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107 17.  That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons *in London* at New-York,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *shipping* commercial men *and members of L.*
    *M.A.A. arbitration in London according to L.M.A.A. rules, English Law London arbitration to apply.*
110 18.  That the Owners shall have a lien upon all cargoes, and all sub-freights *and/or sub-hires* for any monies due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules *1974 and any amendments thereto* 1924, at such port or place in the United States as may be selected by the carrier, and as to
    matters not provided for by those.

117  Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118  United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119  the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120  bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121  or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122  required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123  carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124  place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125  United States money.
126      In the event of accident, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,
127  whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the
128  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
131  ships belonged to strangers.
132      Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *It is understood that the Charter hire is not to contribute to General Average.*
133      20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners. *Bunkers used by the vessel while off-hire to be for Owners' account.*
135      21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136  convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary; at least once in every six months, reckoning from
137  time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138  *(See Clause No. 77).*
139
140      22.  Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes derricks*) capable of handling lifts up to *maximum capacity in accordance with description clause (See Clause No. 52)* three tons, also
141  providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142  same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *sufficient lights as on board for night work and maintain same in efficient working order* lanterns and oil for
143  night work and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144  Charterers to have the use of any gear on board the vessel.
145      23.  *(See Clause No. 58)* Vessel to work night and day if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146  steamer to provide one winchman per hatch to work winches day and night as required, Charterers agreeing to pay officers, engineers, winchmen,
147  deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the refusal of the
148  port, or labor unions, prevent even from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149  insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150  thereby.
151      24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153  etc," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder:
155                                              U. S. A. Clause Paramount
156      This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157  16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of
158  any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159  be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160                                              Both-to-Blame Collision Clause
161      If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162  Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163  hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164  or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165  carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166  owners as part of their claim against the carrying ship or carrier. *United States, Canadian and General Clause Paramount as attached as approximate in all Bills of Lading issued hereunder to be incorporated.*
167      25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging. *Vessel not to be required to force ice nor follow ice breaker when inward bound.*
170      26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172      27.  A commission of 2 1/2 *1.25* per cent is payable by the Vessel and Owners to *(to be deducted by Charterers from hire payments and paid by the Charterers)* Lorentzen & Stemoco & Sobelnord SA *and 1.25 per cent to Banchero Costa & Co. SPA, Genoa to be paid by Owners*
173
174  on the hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175      28.  An address commission of 2 1/2 per cent payable to *the Charterers* ............................................... on the hire earned and paid under this Charter.

*Rider Clauses No. 29 to 90 both inclusive and additional clauses (from New Both to Blame Collision Clause to Bunker Fuel Sulphur Content Clause) as attached hereto, are to be considered as an integral part of this Charter Party.*

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

Clause 29          Stevedore Damages
Charterers are not to be responsible for stevedore damage or other damage to the
Vessel unless notified in writing by the Master at the time of occurrence of damage or
as soon as possible thereafter, but within 48 hours from occurrence except in case of
hidden damage which to be notified as soon as possible after discovery, but in any case
not later than upon completion of the voyage and/or discharge during which the
damage was incurred. Master shall cooperate with Charterers or their agents to
obtain a written acknowledgment by the responsible parties causing damage unless
the damage should have been made good. In the meantime,  Owners to settle
stevedore damages directly with stevedores but the Charterers to remain ultimately
responsible, although stevedores to be servants of the Charterers.
Charterers have the option of redelivering the Vessel without repairing stevedore
damage provided such damage may remain for occasional repair when the ship is to
dock for Owners account and same is to be done simultaneously with Owner's work
that Charterers pay the actual cost of repair for stevedore damage, not the time used.
All damages affecting Class seaworthiness and Vessels trading capabilities to be
repaired by Charterers at Charterers' time and cost. The repair must be done up to
Master's and Class surveyor's satisfaction.

Clause 30          Bunker Clause
Bunkers on delivery: IFO about 1100 metric tons and MDO about 150 metric tons.
(Owners confirm bunkers sufficient to perform Charterers' intended voyage).

Bunkers on redelivery to be the same quantity as on delivery.

Same bunker prices both ends: USD400 per metric ton for IFO and USD 600 per
metric ton for MDO.

Charterers to pay value of estimated bunker consumption together with 1st charter
hire.

The Charterers are allowed to replenish bunkers before delivery at Charterers'
expenses, and the Owners are allowed to replenish bunkers before redelivery at
Owners' expenses subject to the Charterers' prior approval which not to be
unreasonably withheld.

Wherever the word 'fuel' appears in this Time Charter Party, same is understood to
mean "bunkers", Fuel Oil to conform with ISO 8217 RMG 35, or RMH 35 in case
RMG 35 is not physically available at the considered bunkering place.
Diesel Oil to conform with ISO 8217 DMB.
Charterers have the option to supply RMF 180 CST in ports where no IFO 380 CST is
available.

Clause 31          Hold Cleaning
Hold Cleaniness
On arrival at first loading port Vessel's holds, to be clean, washed down by fresh
water and dried up so as to receive/carry Charterers' intended cargo in all respects
free of salt, rust scale and previous cargo residues to satisfaction of the independent

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

surveyors. Should Vessel not be approved by surveyor then the Vessel to be placed off-hire from the failure of inspection until Vessel is fully accepted and directly related expenses including bunkers consumed during off-hire incurred thereby to be for Owners account.

Intermediate Hold Cleaning
Deleted as not applicable.

Clause 32    Watchmen
Watchmen hired from shore for cargo to be for Charterers' account, for Vessel to be for Owners' account provided specifically ordered by Master. Compulsory watchmen to be for Charterers account.

Clause 33    On-hire/Off-hire Surveys
A joint on-hire and off-hire to be carried upon delivery and redelivery to ascertain vessel's conditions on delivery/redelivery and bunkers' quantity remaining on board on delivery/redelivery by a surveyor acceptable to both parties. Time for on- hire survey to be for Owners' account and for off-hire for Charterers' account but costs to be equally shared between both parties.

Clause 34    Redelivery
a) It is agreed that Owners at port of redelivery are to take over the Vessel immediately ready, day or night Saturdays, Sundays included, on dropping last outward sea pilot. With reference to Clause 4, it is understood that redelivery notice(s) will be given by Time-charterers in good faith and based upon information given to them.

b) If vessel will load next cargo at same port as  redelivery port, then redelivery to be when/where ready provided no hold cleaning to take place and provided loading can take place at the same berth immediately after completion.

Clause 35    Insurance
All taxes on cargo and voyage freights to be for Charterers' account.
Ref. line 32 and Clause 41 of "Trading Exclusion", Basic war insurance premium for worldwide trading shall be for Owners' account and premium for Hull and Machinery and officers/crew and crew war bonus, if any, due to Vessel's trading to the restricted areas shall be for Charterers' Account, but such trading always to be subject to Owners' prior approval. Insurance/extra insurance not to exceed official quotation by Lloyds underwriters, London, however, if such insurance is not obtainable commercially or through a government, the Owner shall have the right to refuse Vessel entering into war zone. In case a war risk situation develops after the Vessel has loaded a cargo, the terms of "CONWARTIME 2004" War clause to be applied. Any premium for blocking and trapping in war areas to be for Charterers' account.
Charterers have the right to break Institute Warranty Limits subject to Owners' prior approval which not to be unreasonably withheld. Charterers to reimburse extra insurance premium incurred thereby but not higher than quoted by Lloyds London and only payable against original invoice.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

### Clause 36    Agents
Charterers will have their agents to attend Owners' minor/normal husbandry affairs without charging separate agency fees, however should there be an extraordinary matter such as dry-dock, special survey, major repair, general average work for Owner's account, Owners shall employ Charterers' agents as Owners husbandry agents and pay agency as per local recognized tariff or Owners at their option shall appoint own husbandry agents at their expense.

### Clause 37  Grace Period
If there is any failure in punctual payment due to oversight or negligence or error or omission of Charterers' employee, Bankers or agents otherwise for any reason when there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners three banking working days written notice to rectify the failure and when so rectified, the payment shall stand as punctual payment but if Charterers fail to rectify the payment within three banking working days, Owners to hold the option put Charterers on notice that they are going to withdraw the Vessel from the service.

### Clause 38    Warranties
Owners further warrant that this Vessel has not entered Cuban, ports or place since November 1962 nor will enter such port or place prior to delivery under this Charter Party. It is further understood that this Vessel is not blacklisted by Arab countries and also that Vessel has full bunkering privileges in the United States ports and in not restricted due to previous trading.
Vessel is not blacklisted by Canada/U.S.A, in relation to recent Yugoslavia etc.
Owners guarantee Vessel has not traded C.I.S. Pacific ports in the past 2 years.

### Clause 39    Master's Instructions
The Master is to conform with Charterers' or their representatives' or their agents' instructions and to execute the voyage(s) with the same due care and diligence as if he was trading for Owners' own account. Charterers to furnish Master with voyage report forms and other relevant documents which the Master to return to Charterers reporting about voyages performed including log abstracts. Such documents to be written in English.

### Clause 40    Condition Inspection
Charterers to have the option of holding a condition inspection including hose testing for checking hatchsealing integrity at any time during currency of this Charter Party, the Owners and Master giving every facility and assistance to carry out this inspection which to be carried out without interrupting the working of the Vessel and without incurring expenses for the Owners.

### Clause 41    Trading exclusions (areas)
Trading area to be worldwide within IWL but excluding Israel, all Russian Pacific ports, Iraq, Cambodia, Kampuchea, Cuba, Salvador, Congo (Brazzaville), Somalia, Yemen, Liberia, North Korea, war or warlike zones and any countries banned/boycotted by USA. or U.N.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

Should political situation and practices of international shipping change, Charterers and Owners may discuss in a bonafide spirit to agree to include or exclude any countries.

Charterers have the option to break IWL subject to Owners prior consent, which not to be unreasonably withheld and Charterers to pay all extras as charged by vessel's insurance company against Owners' underwriters' net invoice, which not to exceed premia charged at Lloyds of London.

Clause 42 · Return Premium
Charterers to have the benefit of any return insurance premium received by Owners from Underwriters as and when received from the underwriters by reason of Vessel being in port for minimum of thirty (30) days provided Vessel is on-hire for such time. But Owners not to be held responsible for any deficiency in speed/consumption due to foul bottom as a result of prolonged stay in port. In case Vessel is off-hire for more than thirty (30) days consecutive days, Owners and Charterers mutually discuss and find amicable settlement as to how to perform the remaining period of this Charter Party.

Clause 43    Deviation/off-hire Clause
In the event of the Vessel deviating (which expression includes putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or for any purpose, unless caused by acts or omission or default of the Charterers, the hire shall be suspended as from the commencement of such deviation until the time when the Vessel is again ready and in an efficient state to resume her service from a position not less favorable to Charterers than that at which the deviation commenced. In the event of Vessel for any cause or for any purpose aforesaid, putting, onto any port other then the port for which she is bound on the instructions of Charterers, the port charge, pilotage and other expenses at such port shall be borne by Owners.

Clause 44    Certificates
Vessel to be in possession of the necessary certificates, including deratization certificate to comply with the safety and health regulations and all current requirements at all ports of call during the currency of this Charter Party.
Vessel will comply with and be maintained in accordance with the requirements of the Commonwealth of Australia loading and unloading safety measure regulations, including Commonwealth of Australia Navigation regulations, order No. 12 of 1986, including regulations dated 8.8.1986 and all cargo gear to be approved by Australian Waterside Workers Federationl Vessel to be in possession of a valid and approved cargo gear certificates in accordance with American Cargo Gear regulations. Any time lost or expenses involved by not having or in obtaining such as valid or approved certificate to be for Owners' account. Owners assure Charterers that conditions aboard this Vessel conform with SOLAS 1974 (pertains to loading grain cargoes at United States' ports and the Vessels capacity plan should so indicate and refer to untrimmed hold ends) Vessel to have an board as approved grain loading certificate from the Vessels country of registry.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

### Clause 45 Safety regulations
It is understood that Vessel will comply with any safety regulations and/or requirements in effect at all ports of loading and/or discharging, a particular reference is the United State Department of labour safety and Health Regulations including as set forth in part III of the Federal Register. Should the Vessel not meet safety rules and regulations Owners will make immediate corrective measure and any stevedore standby time and other expenses involved including off-hire will be for the Owners' account.

### Clause 46 Boycott clause
Should the vessel be captured, seized, detained, arrested, or boycotted by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and/or during the above capture or seizure or detention or arrest shall be for Owners' account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of cargo or calling port or trading under this Charter.

### Clause 47 Oil pollution clause p and i group recommended clause
Financial responsibility in respect of pollution
(1) Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:

a)      Certificates issued pursuant to Section 311 (P) of the US Federal Water Pollution Control Act, as amended (title 33 US Code Section 1321 (p)
b)      Deleted.

(2) Notwithstanding anything whether printed or typed herein to the contrary,

(a) save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any country, state or territory in performance of this charter.

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.

(c) shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill(s) of lading issued pursuant to this may sustain by reason of the Vessel inability to perform as aforesaid.

3) Charterers warrant that the terms of this clause will be incorporated effectively into any bill(s) of lading issued pursuant to this charter.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

### Clause 48    Grab suitability
Deleted.

### Clause 49    Protective clause
The New Both-to-Blame Collision, The New Jason Clause and Voy War 2004, P and I Nuclear Clause, as applicable, are all to be considered as part of this Charter Party and Bill(s) of Lading shall be subject to all said clause. The U.S.A. and Canada, Clause Paramount as applicable, or the Hague Rules as enacted in countries other than the U.S.A. and Canada, as applicable to be incorporated in all Bill(s) of Lading and this Charter.

### Clause 50    Bill(s) of Lading
No through Bill(s) of Lading to be issued
Neither the Charterers nor their agents permit the issue of any Bill(s) of Lading, Way Bill(s) or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners, or on the Charterers' behalf, or on behalf of any sub-charterers) incorporating, whether or not compulsory applicable, the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against liability loss or damage which may result from any breach of the foregoing provisions of the clause.
Owners/Master to authorize Charterers and/or their agents to sign/release original Bill(s) of Lading if required by Charterers, but always in accordance to the mote receipts and tally receipt. Charterers to have option to use Seawaybill(s) if required by head Charterers. And Charterers hereby indemnify Owners for above.

### Clause 51    Radio clause
The vessel shall communicate with Charterers via Satcom or E-mail if available. Please note cable communication not available.

### Clause 52    Vessel's description
MV GIOVANNI DELLA GATTA
TYPE: GEARLESS SELFTRIMMING BULKCARRIER
FLAG: ITALIAN
SHIPYARD: FINCANTIERI
PLACE OF BUILDING: CASTELLAMARE DI STABIA
YEAR: 1987
HULL N.: 5827
COMPARTMENT: NAPOLI
CALL OF SIGN: IBSO
IMO NUMBER: 8506488
CLASS: HIGHEST R.I.N.A.
P + I CLUB: STANDARD OF BERMUDA
H + M VALUE: 30.000.000 USD
SUMMER DWAT / DRAFT: 64.796 MT ON 12,92 M TROPICAL DWAT / DRAFT: 66.515 MT ON
13,18 M TROPICAL FW DWAT / DRAFT: 66.483 MT ON 13,48 M FW DWAT / DRAFT: 64.796 MT
ON 13,21 M WINTER DWAT / DRAFT: 63.081 MT ON 12,65 M, TPC: 63,9

CUBIC FEET BREAKDOWN:  N.1  313.833
                       N.2  400.173
                       N.3  398.902

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

```
N.4  398.090
N.5  400.943
N.6  400.943
N.7  373.493
---------------------
TOTAL  2.686.370
```

NUMBERS HOLDS / HATCHES: 7 / 7
HOLD USED AS BALLAST: N.4
HATCHES TYPE: MC GREGOR SIDE ROLLING

HATCHES DIMENSIONS: N.1:  12,8 M X 15,0 M
N.2-7:  16,0 M X 15,0 M

TANK TOP STRENGTH: HOLDS 1/3/5/7: 28.12 TONS / SQM
HOLDS 2/4/6: 15.76 TONS / SQM

LOA: 224,95 M
LBP: 216,45 M
BEAM: 32,20 M
MOULDED DEPTH: 17,80 M

DISTANCE FROM FACE BRIDGE TO FORE AND AFT: 186,95 M / 38,00 M DISTANCE FROM KELL TO HATCH COAMING: 20,75 M DISTANCE FROM KELL TO HATCH COVER (OPEN POS): 24,75 M
DISTANCE FROM SHIP SIDE TO FOOT OF OPPOSITE HOPPER: 26,00 M DISTANCE FROM HATCHCOAMING TO FWB BULKHEADS FOR ALL HOLDS: N.1-7 20,10 M   N.5 19,50 M

DISTANCE FROM HATCHCOAMING HOLD N.1 TO AFT HATCHCOAMING OF THE LAST HOLD: 162,00M
INTERNATIONAL GT / NT: 35.560 / 21.595 SUEZ GT / NT: 35.389,92 / 30.904,33
PANAMA GT / NT: 36.182,51 / 28.787,83

LIGHTSHIP: 11.025

TYPE OF LADDER: AUSTRALIAN HOLD LADDER
VERTICAL HOLD LADDER

TYPE OF CORRUGATION: ZETA TYPE

VSL CAN MAINTAIN 31 METRES FM WLINE TO TOP MAST DURING DISCHARGING IN GENOA: YES

CARGO INTAKE BASIS PANAMA CANAL: ABT 56.700 MT ON DRAFT 39'06" ALL TOLD BUT DEPENDING ON FINAL DWAT

SPEED AND CONSUMPTIONS: BALLAST ABT 12,5 KN ON ABT 28 MT IFO 380 CST + ABT 2,6 MT MDO
LADEN ABT 12,5 KN ON ABT 30 MT IFO 380 CST + ABT 2,6 MT MDO
PORT CONSUMPTIONS: ABT 2,6 MT MDO DAILY
BUNKER TYPE: IFO 380 CST RMG 35 ISO 1996
MDO DMB ISO 1996

ALL DETAILS ARE 'ABOUT'

VESSEL HAS ON BOARD SOFT MOORING LINES OF AT LEAST 200M IN LENGTH FORE AND AFT AND NO WIRE ROPES.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

### Clause 53     Australian Hold Ladders/Cranes
Vessel to be fitted with hold ladders in accordance with Australian Navigation Act on delivery and Owners to maintain same in efficient order during the currency of this Charter Party. Cranes to be constructed and maintained   in accordance with Australian Navigation Act.

### Clause 54     Cargo Claims
Any liability to third parties for cargo claims be born by Owners/Charterers in accordance with the Interclub NYPE agreement dated  May 1984 and subsequent amendments.

### Clause 55     Cargo Exclusions
The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature unless carried in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any intermediate countries or ports through whose waters the vessel must pass.

Notwithstanding provisions of above paragraph, Charterers have the option to load dangerous/ injurious or inflammable goods upto 500 mt per voyage, provided same is packed/labeled/loaded/ lashed and discharged in accordance with IMO as well as local/international regulations and always excluding IMO Class 1 and 7. Without prejudice to the generality of the foregoing, in addition the following are specifically excluded:

Livestock of any description, arms, ammunition, explosives (black powder, blasting caps, loaded bombs, detonators, dynamite, TNT) nuclear and radioactive materials and its waste, tar in bulk, turnings and motor blocks, hot briquetted iron, petroleum and it's by-products, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hydrochloride, bonemeal, charcoal, turpentine, ferro silicon, resin, cotton, nitrate, lime, Chilean nitrate, copra, pond coal, pebbles, brown coal, Indian coal (well understood that it means cosl loaded in India), sponge iron, asphalt, sunflower seed expellers, ammonium nitrate (but fertilizer grade which does not require C02 or inert gas system in cargo hold is permitted), naphtha and its products, direct reduced iron, direct reduced iron ore pellets, asbestos, fishmeal, wet hides, creosoted goods, calcium carbide motor spirits, industrial waste, acids, logs, lumbar and any other cargoes (except coal and sulphur) listed in Appendix B to BC Code.

Oilseeds/oil cakes/seed cakes/soyabean meal (as the case might be) are allowed provided loaded within IMO regulations.

In case of loading Salt
Maximum two (2) cargoes of salt per year, but shall not be consecutive voyages and shall not be last voyage before redelivery which is to be loaded, stowed, carried and discharged strictly in accordance with applicable national/international regulations and/or IMO Code and recommendations at Charterers' risk and expense. If lime coating/washing of holds is required by Shippers and Owners, Charterers to arrange following at the Charterers' time and expenses. To coat holds with lime which is supplied by Charterers to Master's satisfaction prior to loading salt and to arrange

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

removal of the same Master's satisfaction. Charterers may request the vessel's crew to perform above removal of lime paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

In case of loading Cement
Maximum two (2) cargoes of cement per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. Charterers may request the vessel's crew to perform hold cleaning paying lumpsum USD 400 bonus per hold in addition to regular intermediate hold cleaning fee, subject Owners and vessel shall not guarantee that holds will be sufficiently cleaned/ accepted at next loading port. Charterers shall provide the vessel with one set each of a Water-Tobey and submerged pump to facilitate such extra works by the vessel's crew. Owners to seal all hatches where such cargo loaded by marine tape or similar tape if required by Charterers, but cost of such tape to be reimbursed by Charterers upon completion of loading. The vessel's bilge line will not be customarily used for discharge of bilge water after hold cleaning of cement.

In case of loading Scrap
Charterers to have the option to load a maximum of two (2) cargoes of scrap per each trading year, but shall not be consecutive voyages and shall not be last voyage before redelivery, provided however that;
(1) The scrap mentioned herein is only limited to HMS 1 + 2 and shredded scrap specifically non-oily and Always excluding motor blocks, turnings, metal borings and cuttings.
(2) Charterers undertake to use as few holds as possible provided the vessel's stability and stress permit.
(3) Charterers undertake that the first layer of scarp to be loaded is not to be released until touching the tanktop and not to be damped/dropped during loading. The first layer of scrap to be loaded, stowed, trimmed to Master's satisfaction before loading the balance of the cargo.

In case of loading Petcoke
Charterers have the liberty of carrying max 3 cargoes of non oily petroleum coke (whether it be full or part cargo), each year if exercised on following conditions;

a) The petroleum coke mentioned herein is only limited to the type of non-hazardous/non-dangerous green delayed type and/or calcined type.
b) If Charterers exercise such options, Charterers undertake to use the least number of holds possible, provided vessel's stability turn and stress permitting.
c) Such cargo to be loaded/stowed/trimmed/discharged strictly according latest IMO and/or any other latest regulations/rules applicable to such cargo,
d) Should any additional/special wash down of holds before loading be reasonably recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time, however, Master and crew to always cooperate with Charterers.
e) After discharging Charterers to arrange at their expense/time any additional/special wash down of holds carrying such cargo by chemicals as Master reasonably considers if necessary, however, Master and crews to

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

    always cooperate with Charterers.
   f)   Such cargo not to be last cargo prior redelivery.
   g)   Any extra expenses resulting there from/incurred thereby and any detention through any of the above causes to be for Charterers' account.

### Clause 56    Captain's Conduct

It is understood that if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers or Engineers, the Owners shall on receiving particulars of the complain, investigate same and if necessary make a change in the appointment but this provision does not affect the Charterers' rights to advance any claims or require arbitration under Clause NO.17 of disputes regarding the conduct of the Master in prosecution of voyages and in carrying out the orders and directions of the Charterers.

### Clause 57    Itinerary

Deleted.

### Clause 58    Breakdown of cargo gear

Deleted.

### Clause 59    Crew Service

Subject to local regulations permit, the following service in respect of loading and discharging, operation from officers and crew are included in hire

1. Raising, lowering and rigging cranes find/or gangways in preparation for loading and discharging, if port regulation permits.
2. Opening and closing of hatches in connection with loading and discharging if local regulations allow, otherwise to be for Charterers' account.
3. Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, if port regulation permits.
4. Maintaining sufficient electric power and all cranes whilst loading and discharging including regular maintenance and shifting between berths.
5. Docking and unlocking in connection with loading/discharging cargo or bunker. Necessary assistance in the Vessel's bunkering operation.
6. Officers and crew to shape up Vessel's hatches and cranes as much as possible prior to arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to seaworthiness, weather condition and safety of crew.

The above service shall be considered as a minimum and done as Charterers servants and shall in no way be construed as and alternative to or reduction in the standard of services from officers and crew required under this Charter Party.

### Clause 60    Charterers' Gear Maintenance

Deleted.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

**Clause 61    Deck cargo**
No Deck cargo allowed.

**Clause 62    Capture/Seizure/Detention/Arrest**
Should the Vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter- Party for any reason attributable to the Owners, the payment of hire shall be suspended until the time of her release. Off-hire to be for any time actually lost. Any extra expenses incurred by and/or during such capture or seizure or detention or arrest shall be for Owners' account.

**Clause 63    Bimco Double-Banking Clause**
A)  The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading and discharging of cargo and/or bunkering.

B) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this Clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

C) Without prejudice to the generality of the Charterers' right under (A) and (B), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (A) and (B) if in his reasonable opinion it is not safe so to do.

D) The Owners shall be entitled to' insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

But the insurance premium should not be higher than Lloyd's quote and against supporting vouchers.

E) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

**Clause 64    Lumpsum amount for cable/entertainment/victualling**
Charterers to pay Owners lumpsum USD1,250 per month or pro rata for cable/ entertainment/victualling etc.

**Clause 65    Time calculation**
The time for delivery/redelivery shall be adjusted to GMT.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

### Clause 66    In lieu of hold cleaning

Charterers shall have the option to redeliver the vessel without cleaning of holds against paying the Owners a lumpsum of US$4,500 in lieu of such cleaning. However, Charterers shall arrange, at their own account, dunnage by shore labor. Alternatively, subject to consent by crew and subject to port regulations, Charterers have the option of using crew for dunnage removal. Charterers shall remain responsible for the disposal and any costs related thereto.

### Clause 67    Trim and stability

Cargoes to be loaded and distributed in such a manner that the vessel bending moments, stress forces/ trim and stability will not exceed permissible limitations. Vessel to be left in safe seaworthy trim for shifting between berth and all ports to Masters' satisfaction.

### Clause 68    Discharge of cargo without presentation of original bill(s) of Lading

Owners allow Charterers to discharge cargo without presentation of Original Bill(s) of Lading by providing Owners with Charterers Letter of Indemnity in accordance with Owners P and I Club form and wording before discharging. Letter of Indemnity to be signed by Charterers only.

### Clause 69    Weather routing

The performance details of the Vessel given in this charter Party are based upon performance in good weather conditions and the words good weather conditions shall mean any weather condition in which the, wind force does not exceed Force 4 on the Beaufort Scale, sea condition up to sea state 3 on the Douglas Scale, and no adverse current.

Charterers shall supply weather services from DMI to the Master/Vessel during any period of time/any specified voyage while under the present Charter party. The DMI service cost shall be for Charterers' account. The Master shall comply with the reporting procedures of the weather service and follow its recommendations with regard to optimum course(s), but the Master may deviate from the route if he has reasonable grounds to believe that such a route will compromise the safe navigation of the Vessel.

In the event the Charterers supply the Master with weather routing information although not obliged to follow such routing information, the Master shall comply with the reporting procedure of that service. Should the Vessels Master elect not to follow DMIs recommendations, both DMI and Charterers shall be advised by radio message giving reasons for non-compliance.

The Vessel is allowed to use Marine Diesel Oil when maneuvering and passing narrow/ restricted/ confined water including when the Vessel carries out hold cleaning and bilge pumping.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

### Clause 70   War cancellation
If war breaks out between any two or more of following countries:

U.S.A., C.I.S., Peoples Republic of China, South Korea and Japan directly affecting the performance of the charter Party, both Owners and Charterers shall have the option to cancel of the Charter whereupon the Charterers shall redeliver the Vessel to the Owners. If she has the cargo on board after discharge thereof at destination or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays or if sea a near and safe port as directed by the Charterers. In all cases hire shall be paid until the Vessels redelivery.

### Clause 71   Quarantine
Normal quarantine time and expenses for the Vessel entering port shall be for the Charterers account, but any time of detention and expenses for quarantine due to pestilence, epidemics
among or illness of captain, officers and crew shall be for Owners' account.

### Clause 72   Smuggling
Any delay, expenses and/or fines incurred op account of smuggling shall be for Owners account if caused by the officers and/or crew and shall be for the Charterers' account if caused by the Charterers' supercargo and/or their staff of agents,

### Clause 73   Additional equipments/fittings
The Charterers, subject to Owners' prior approval not to be unreasonably withheld, shall be at liberty to fit any additional equipment/fittings for loading, discharging and/or securing cargo and such fittings are not to affect the structure of the Vessel including coating in tanks etc. Such work shall be done al the Charterers' expenses and time and the Charterers shall remove such equipment and fitting and restore the Vessel to her original conditions including repair of coatings at their expenses and time prior redelivery.

Charterers option to weld padeyes upper Master's supervision and subject to Master's approval which not to be unreasonably withheld and Charterers to remove padeyes. Charterers further option to redeliver Vessel without removal of padeyes in consideration of Charterers to pay owners USD10.00 per padeye.

Vessel has no cement holes on hatches; however, Charterers have the option to make holes in each hatch for loading cement in bulk at their time and expenses, subject to Builders' confirmation.

### Clause 74   U.S. unique bill(s) of lading identifier clause
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF par 4 section 4. 7A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

### Clause 75    Admixture clause
Deleted.

### Clause 76    IMO clause
The Charterers are to provide the Master with any evidence he may reasonably require to show that the cargo is packed, labeled, loaded/ stowed, carried and discharged in accordance with IMO regulations, failing which the Master is entitled to refuse to load such cargo, or if already loaded, to unload it at Charterers' risk and expenses, however, Charterers to be given reasonable amount of time to comply with Master's request prior Master, Owners taking corresponding action. In case local and/or national authorities require special documentation for any cargoes covered by IMO Code, Charterers are to list cargoes (always in accordance with the Charter Party-see also cargo exclusion Clause No. 58) then they are to reimburse Owners for any extra expenses fey Owners as a result of same.

### Clause 77    Drydocking clause
Drydocking only allowed in case of emergency.

### Clause 78    Payments
Bunker value remaining on board on delivery to be paid within three (3) banking days after Vessel's delivery. Charterers are entitled to deduct estimate Owners' expenses /maximum USD 600 per port and bunker value on redelivery from last sufficient hire. The time for delivery/redelivery shall be adjusted to GMT.

Owners Bank details:

### Clause 79    ISM Clause
From the date of coming into force of the International safety  management (ISM) code in relation to the vessel and thereafter during the currency of the charter party, the Owners shall procure that the vessel and the company (as defined by the ISM Code)  shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant document of compliance (DOC) and safety management certificate (SMC) to the Charterers.

Except as otherwise provided in this charter party, loss, damage, expenses or delay caused by the failure on the part of the Owners or "the company" to comply with the ism code, shall be for Owners' account.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

Clause 80    Fumigation clause

Charterers are on written request permitted to fumigate Vessel's holds with or without cargo on board at loading and discharging port(s) or places en route at their risk and expenses and warrant that fumigants will not expose officers and Crew as well as other persons on board the Vessel during and after the fumigation to any health hazard whatsoever and will comply with current IMO regulations, Charterers undertake to also pay Owners all necessary expenses incurred because or the fumigation including necessary expenses for accommodating and victualling Vessel's personnel ashore and to indemnify Owners in respect of any liability, loss/ damage, or expenses which they may sustain because of the fumigation. Any time lost thereby counts as on-hire. If requested by Charterers the Vessel is to be fumigated en route from loading port(s) to the first discharging port. The fumigation procedure involves the use of the product phosphine. If requested by Charterers, Owners/Master will not insist that a technician accompany the Vessel subject to Charterers' agreeable following to be added, for log loading.

1) Charterers shall furnish Owners the Letter of Indemnity ('"sample as per attached);
2) Charterers shall arrange proper training and documentation for crew in such manner satisfying IMO recommendations by fumigation;
3) Initial setting of fumigants shall be made by the fumigator without involving crew members;
4) Charterers shall supply proper equipment for fumigation which to be retained until complete discharging of the cargo. Charterers to provide all the necessary apparatus if needed according to local regulation/IMO regulation;
5) Charterers shall remove residue of fumigant where possible at the first port of discharging after fumigation completed;
6) Charterers fumigation company shall be available to Ship/Owners/Shipmanagers for information and advisee during entire voyage of in-transit fumigation.

Sample of L.O.I.

Letter of Indemnity to be given in return for fumigation transit
"To the Owners, Master and Agent of the M.V.

Dear Sirs,

The above ship shall not be required to fumigate the holds for the cargo of log to be loaded at on or around under the above Charter Party but notwithstanding the provisions of the above Charter Party, we hereby request you to comply with Charterers' order of fumigation while the Vessel, M.V. is in transit to for the above cargo of log.

In consideration of your complying with our above request, we hereby agree as follow:

(1) To indemnify you, your servants and agent and to hold all of you harmless in respect of any liability, loss, damage or expenses of whatsoever nature that you may sustain by reason of the fumigation done in accordance with our request, where such losses, liabilities or damages are not already covered under Owners' existing

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

insurance arrangements and providing such losses /liabilities /damages are not caused by negligence of Owners/Master and/or their servants.

(2) In the event of any proceeding being commenced against you or any of your servants or agents in connection with fumigation done as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

(3) If, in connection with fumigation done as aforesaid, the Ship should be arrested or detained or should arrest or detention thereof be threatened, or should there by any interference in the use of trading of the Vessel (whether by virtue of a caveat being entered on the Ship's registry or otherwise however), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such Ship or properly or to remove such interference and to indemnify you in respect of any liability/ loss, damage or expense caused by such arrest or detention or threatened arrest of detention or such interference may be justified.

(4) The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person whether or not such person is party to or liable under this indemnity.

(5) This indemnity shall be governed by and construed in accordance with Japanese law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the district court of Japan.

Yours faithfully"

## Clause 81    Consumption of MDO
The vessel to have the liberty of using diesel oil when entering and leaving port and for maneuvering in shallow narrow waters, canals and rivers.

## Clause 82    Charterers' colour
Charterers shall have privilege of flying their own funnel mark and deciding the vessels name subject to Owner's approval which to be M.V. "TBN" the Vessel shall be repainted in Owners funnel color before termination of the Charter and the cost and time of re-painting, shall be for Charterers' account.

## Clause 83    Assignment
Acknowledgement and consent by Charterers for assignment of Charter Party and Charter hire shall be given to Owners' financier(s) for finance purpose.

## Clause 84    ITF
Owners guarantee that the Vessel's officers and crew on board are employed under conditions approved by ITF during the whole Charter period.

## Clause 85
Deleted.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

**Clause 86    Time Charter Period**
Deleted.

**Clause 87    Speed claims/miss description**
If during the currency of this Charter Party the speed of the Vessel (as described in Clause 52) be reduced and/or oil fuel consumption be increased, Charterers, after receiving confirmation of such reduction of speed or increase in consumption from Owners, shall have the right to deduct from hire an amount equivalent to the time lost and/or cost of any extra fuel consumed (with supporting vouchers for bunker cost) in accordance with the conditions set out below.

Evidence of wind and sea conditions shall be taken from the vessel's logs and independent weather routing reports for the exact route taken by the vessel. In the event of discrepancies between the two, the independent weather routing reports shall prevail.

Performance to be reviewed at the end of each calendar year, any passages less than 24 hours to be excluded from performance settlement, and Owners to receive credit or compensation only to the extent that such credit or compensation shall be applied as offsets to the Charterers' claim for underperformance if and during the review period, (i.e. reduction in speed for 1 particular voyage may be offset against any increase in speed for an other voyage, increase in bunker consumption for 1 particular voyage may be offset against any saving of bunkers for an other voyage).
Charterers shall always make allowance for 0,5 knots in respect of the "about" describing vessel's speed.

**Clause 88    NAABSA Clause**
Naabsa to be allowed in River Plate, Bahia Blanca, Necochea, Uraguay and Brazil where it is customary for similar sized vessels to lie aground only with Owners' prior permission, vessel not required to push mud/sand etc. A diver's survey is to be undertaken after the Naabsa operation which is to be arranged by, and for the account of, the Charterer. Time for the diver's survey will be on-hire.

Any damage found which affects the seaworthiness of the vessel is to be repaired at the Charterers' time and cost immediately. Any other damage (i.e. not affecting the seaworthiness of the vessel) will be repaired at Charterers' cost during the next dry-docking of the vessel, however if said repair extends the period of dry-docking, such time also to be for Charterers' account.

**Clause 89**
Owners have the option to sell the vessel during the currency of the Charter party, with all details/ charter to remain unchanged. Potential new Owners are subject to Charterers approval although same not to be unreasonable withheld.

**Clause 90    Off-hire**
Charterers have the option to add any off-hire time to the charter party period, off-hire means unscheduled off-hire i.e. excluding scheduled drydocking. This is provided such option is declared 30 days prior to redelivery.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the earner against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claims against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact".

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules 1974, but where the adjustment is made in accordance with the law and practice of the United States of America the following clause shall apply:

## THE NEW JASON CLAUSE

In the event of accident, danger damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which, the earner is not responsible, by stature, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average o the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage or special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid as fully as if such salving ship or ships belonged to strangers. Such deposit as the carriers or its agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

## GENERAL CLAUSE PARAMOUNT

This Bill(s) of Lading shall have effect subject to the provision of any legislation relating to the Carriage of Goods by Sea which incorporates the rules relating to Bill(s) of Lading contained in the International convention dated Brussels 25th August,1924, and which is compulsory applicable to the contract of carriage herein contained. When no such enactment is in force in the country of shipment the corresponding legislation of the country of destination shall apply, but in respect of    shipments to which no such enactments are compulsorily application the terms of the Carriage of Good by Sea act/1924 of the United Kingdom or any statutory modification or re-enactment thereof shall apply.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

## U.S.A. CLAUSE PARAMOUNT

This Bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936 which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire the goods are in custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non delivery, or loss of or damage to the goods are not in the actual custody of the carrier.

## CANADIAN CLAUSE PARAMOUNT

All other terms, Provisions and conditions of the Canadian Water Carriage of Good Act, 1936 and of the rules comprising schedule thereto are, so far as applicable, to govern the contract contained in this Bill(s) of Lading and the ship owners are to be entitled to the benefit of all privileges, rights and immunities contained in such Act and in the schedule thereto as if the same were herein specifically set out. If anything herein contained be inconsistent with the said provisions, it shall to the extent of such inconsistency and no further be null and void.

The carrier shall be under no responsibility whatsoever for loss of or damage to goods howsoever and where-so-ever occurring when such loss or damage arise prior to the loading in and/or subsequent to the discharge from the Carrier's Ship.

## WAR RISKS CLAUSE FOR TIME CHARTERS 2004 CODE NAME "CONWARTIME 2004"

1.    For the purpose of this Clause., the words:

a)    "Owners shall include the Ship Owners, barefoot Charterers, Disponent Owners, managers or other operators who are charged with the management of the vessel, and the Master, and

b)    "War Risks" shall include any actual, threatened or reported: war , act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines, (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group or the Government of any State whatsoever, which in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.    The Vessel, unless the written consent of the Owners to be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War- Risks. Should the vessel be within any such place as aforesaid, which only becomes

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

dangerous, or is likely to be to be or to become dangerous, after her entry into it she shall be at liberty to leave it.

3.  The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any whatsoever against vessels of certain flags or Ownership, or again certain cargoes or crews or otherwise however, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

4.

a)  The Owners may effect war risk insurance in respect of the Hull and Machinery of the Vessel and their other interest (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

b)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.      If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages, in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to theOwners by the Charterers at the same time as the next payment of hire is due.

6.     The vessel shall have liberty:
a)    to comply with all orders, directions, recommendations or advice as to departure arrival, routes, sailing in convoy,   ports   of call, stoppages, destinations, discharge of cargo, delivery or in any other way whatsoever, which are given by the Government of the nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions.

b)    to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance.

c)    to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders   of any   other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

d)    to divert and discharge at any other port any cargo or part thereof which may

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

render the vessel liable to confiscation as a contraband carrier;

c)  to divert and call at any port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7.    If, in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading and discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo, shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port or their own choice.

8.    If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

**BIMCO War Risks Clause for Voyage Chartering, 2004 (Code Name: VOYWAR 2004)**
(a) For the purpose of this Clause, the words:

(i)  "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii)  "War Risks" shall include any actual, threatened or reported:

War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(c) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(d) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(e) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, or in order to fulfil the Owners' obligation under this Charter Party, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

premiums and/or calls paid shall be reimbursed by the Charterers to the Owners within 14 days after receipt of the Owners' invoice. If the Vessel discharges all of her cargo within an area subject to additional premiums as herein set forth, the Charterer shall reimburse the Owners for the actual additional premiums paid which may accrue from completion of discharge until the Vessel leaves such area or areas referred to above. The Owners shall leave the area as soon as possible after completion of discharge.

(f) The Vessel shall have liberty:-

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with  national laws aimed at enforcing the same to which the Owners are  subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe  that they may be subject to internment, imprisonment or other  sanctions;

(vi) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(g) If in compliance with any of the provisions of sub-clauses (b) to (f) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

*** WORKING COPY ***
### RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
### CHARTER PARTY DATED 2ND JUNE 2009

## ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

**(ii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(d)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

## BIMCO US CUSTOMS ADVANCE NOTIFICATION / AMS CLAUSE FOR TIME CHARTER PARTIES

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)        Have in place a SCAC (Standard Carrier Alpha Code);
ii)       Have in place an ICB (International Carrier Bond);
iii)      Provide the Owners with a timely confirmation of i) and ii) above; and
iv)       Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/ or damage whatsoever (including consequential loss and/ or damage) and/ or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## BUNKER SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.
The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.
The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b)       Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
(i) the Vessel shall comply with Regulations 14 and 18 of MALPOL Annex VI and

*** WORKING COPY ***
RIDER CLAUSES TO M/V "GIOVANNI DELLA GATTA"
CHARTER PARTY DATED 2ND JUNE 2009

with the requirements of any omission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when
ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a),
the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses
arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of
MARPOL Annex VI.

(c)     For the purpose of this Clause, "emission control zone" shall mean zones
as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or
national authorities such as, but not limited to, the EU and the US Environmental
Protection Agency.

Exhibit 2

POS.    6B
DETULEMAR SHIPPING Spa
Società a Socio Unico

Vat. IT 0279345041

# Hire Balance Request

date:  19-ago-09

Our ref.: 721-5/09

Broker: Banchero

cp: 16/07/09

**HIRE STATEMENT**
Mv   Giovanni Della Gatta
Charterers  OCEANVAST

Prov.Hire Bal



| | Debit USD | Credit USD | Previous hire remitted! #VALORE! upto 19/8/09 23.30 | Actual hire to be INVOICED days |
|---|---|---|---|---|
| **Daily hire rate:  $  18.000,00** | | | 22,0000 | -1,33333 |
| Del.ry:  Geraldton  28/7/09 23.30 GMT | | | 396.000,00 | (23.999,94) |
| Redel.ry:  Jingtang  18/8/09 15.30 GMT | | | 0,00 | 0,00 |
| Days on hire  20,666667 | 372.000,06 | | 0,00 | 0,00 |
| **Less Total time off-hire** (see attached statement)  0,000000 | 0,00 | | 0,00 | 0,00 |
| Total days vessel on-hire  20,666667 | | | 0,00 | 0,00 |
| **BONUS BALLAST** | | | 0,00 | 0,00 |
| Add/comm  2,50% | 350.000,00 | | 350.000,00 | 0,00 |
| Comm.  1,25% LSS | | (18.050,00) | (18.650,00) | 600,00 |
| | | (9.025,00) | (9.325,00) | 300,00 |
| **BUNKERS ON DELIVERY** | | | 0,00 | 0,00 |
| IFO  MT  955,00  MT at USD  400,00 | 382.000,00 | | 382.000,00 | 0,00 |
| MDO MT  82,00  MT at USD  600,00 | 49.200,00 | | 49.200,00 | 0,00 |
| **BUNKERS ON REDELIVERY: estimated** | | | 0,00 | 0,00 |
| IFO  MT  947,00  MT at USD  400,00 | | (378.800,00) | (382.000,00) | 3.200,00 |
| MDO MT  85,00  MT at USD  600,00 | | (51.000,00) | (49.200,00) | (1.800,00) |
| **BUNKERS CONSUMED DURING OFF-HIRE** (see attached statement) | | 0,00 | 0,00 | 0,00 |
| **INTERMEDIATE HOLDS CLEANING:** | | | 0,00 | 0,00 |
| after discharge  0,00 | | | 0,00 | 0,00 |
| n° Holds used  0,00 | | | 0,00 | 0,00 |
| **I.L.O.C.H.** | 4.500,00 | | 4.500,00 | 0,00 |
| **OWNER'S EXPENSES:** | | 0,00 | 0,00 | 0,00 |
| Port     Date     USD     com 2,50%   Total | | | 0,00 | 0,00 |
| 0,00   0/1/00   0,00   0,00   - | | | 0,00 | 0,00 |
| **Cable/Represent/Victuall.:**  at USD  1.250,00  montly/PR. | 849,32 | | 904,11 | (54,79) |
| **VARIOUS** | | | 0,00 | 0,00 |
| Previous c/p balance same vessel/same Charterers | 27.156,14 | | 27.156,14 | 0,00 |
| Estimated Pandi/Illegal expenses for recovering hire not being paid | 25.000,00 | | 25.000,00 | 0,00 |
| **CHARTERES PAYMENTS:** | | | 0,00 | 0,00 |
| 1°  409.975,00 | | | 0,00 | 0,00 |

Giovanni Della Gatta(5)Ocean Vast_2009



DEIULEMAR SHIPPING Spa

Società a Socio Unico

Vat. IT 0279345041

| | |
|---|---|
| Our ref.: | 721-5/09 |
| Broker: | **Banchero** |

## Hire Balance Request

date:    19-ago-09

### HIRE STATEMENT
cp: 16/07/09

Mv          Giovanni Della Gatta
Charterers  OCEANVAST

| | | Prov.Hire Bal | Previous hire remitted: #VALORE! | Actual hire to be INVOICED |
|---|---|---|---|---|
| 2° | 41.156,44 | | 0,00 | 0,00 |
| 3° | 144.647,19 | | 0,00 | 0,00 |
| 4° | 0,00 | | 0,00 | 0,00 |
| | 0,00 | | 0,00 | 0,00 |
| | 595.778,63 | (595.778,63) | - | - |

Prov.Hire Bal        1.210.705,52        1.052.853,63        30.401,41

DUE TO          OWNERS

| | | |
|---|---|---|
| | 0,00 | **158.051,89** USD |
| | 1.210.705,52 | |

due within        Overdue

Notes:

Which please, remit as follows:
Bank :          MONTE DEI PASCHI DI SIENA
Branch of:      TORRE DEL GRECO / NAPLES (ITALY)
Swift:          PASCITMM
Account:        9370
Iban Code:      IT15J 01030 40300 0000 0000 9370
Favour:         DEIULEMAR SHIPPING SPA
Corresponding banks USA: WACHOVIA BANK    Swift: PNBPUS3NNYC
Ref     :       Mv Giovanni Della Gatta/OceanVast/Hire

Giovanni Della Gatta(5)Ocean Vast_2009

Exhibit 3

https://www.commercial.hsbc.com.hk/1/2/!ut/p/kcxml/04_Sj9Sfy..._PageTitle&cmd_scmPage=R2G_SCMPortlet&cmd_default=R2G_Header    09-8-18 下午1:47

**HSBC ◇◆ 滙豐    香港**    (Print)

## 付款

已接獲您的指示。

| | |
|---|---|
| 交易號碼 | N319000059763 |
| 電匯號碼 | TT SP0550952 |
| 支款戶口 | ████ 商業綜合戶口 USD 美元 儲蓄 |
| 付款金額 | USD 美元 234,672.19 |
| 付款日期 | 2009年9月18日 |
| 受款銀行地區 | ITALY |
| 受款銀行名稱 | BANCA MONTE DEI PASCHI DI SIENA SPA |
| 受款銀行地址 | VIA ROBELLINI 16-18 MILAN 20124 ITALY |
| 受款銀行 SWIFT 地址BIC | PASCITMM |
| 受款人戶口號碼/IBAN | ████ |
| 受款人名稱 | DEIULEMAR SHIPPING SPA |
| 受款人地址 | |
| 附言給受款人 | |
| 附言給受款銀行 | |
| 費用付款方 | 本公司支付本地銀行費用，受款人支付海外銀行費用。 |
| 扣除費用之戶口 | 與支款戶口相同 |
| 中介銀行地區 | UNITED STATES |
| 中介銀行名稱 | WACHOVIA BANK NATIONAL ASSOCIATION |
| 中介銀行地址 | INTL BR COLLECTIONS CLEARANCE A/C 11 PENN PLAZA 4TH FLOOR NEW YORK NY 10001 U S A |
| 中介銀行 SWIFT 地址BIC | PNBPUS3NNYC |
| 本地服務費 | HKD 港元 77.00 |

第1页（共1页）

Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DEIULEMAR SHIPPING SPA,

                                 Plaintiff,           09 CV

-v-

OCEANVAST INTERNATIONAL CO. LTD.,    **ATTORNEY'S DECLARATION
THAT DEFENDANT CANNOT BE
FOUND IN THE DISTRICT**

                               Defendant.
-------------------------------------------------------------------x

       This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff,

DEIULEMAR SHIPPING SPA, in order to secure the issuance of a Summons and Process of

Maritime Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

       Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of

perjury:

       I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above

referenced matter.

       I am familiar with the circumstances of the Verified Complaint, and I submit this

declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment

and Garnishment of the property of the defendant, OCEANVAST INTERNATIONAL CO.

LTD., pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims

of the Federal Rules of Civil Procedure.

       I have personally inquired or have directed inquiries into the presence of the defendant in

this District.

       I have personally checked with the office of the Secretary of State of the State of New

York, using the Secretary of State's Division of Corporations database, and I have determined

that, as of August 26, 2009, the defendant is not incorporated pursuant to the laws of New York,

and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendant can be located within this District. The Verizon Telephone Company has advised me that the defendant does not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendant within this District.

I have engaged in a Google search as to whether the defendant can be located within this District. The Google search results did not provide any information that defendant is found in this District.

I am unaware of any general or managing agent(s) within this District for the defendant.

In that I have been able to determine that the defendant has not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendant does not have sufficient contacts or business activities within this District and does not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendant, OCEANVAST INTERNATIONAL CO. LTD., cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: Oyster Bay, New York
      August 26, 2009

                        CHALOS & CO, P.C.
                        Attorneys for Plaintiff
                        DEIULEMAR SHIPPING SPA

By:      _____
                        George M. Chalos (GC-8693)
                        123 South Street
                        Oyster Bay, New York 11771
                        Tel: (516) 714-4300
                        Fax: (866) 702-4577
                        Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

DEIULEMAR SHIPPING SPA,

                                    Plaintiff,            09 CV

      -v-
                                                    **VERIFICATION OF**
                                                    **COMPLAINT**

OCEANVAST INTERNATIONAL CO. LTD.,
                                    Defendant.
--------------------------------------------------------------------x

       Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of
perjury:

     1.     I am a Member of the law firm of CHALOS & CO, P.C., counsel for the

Plaintiff, DEIULEMAR SHIPPING SPA herein;

     2.     I have read the foregoing Verified Complaint and know the contents thereof; and

     3.     I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

     4.     The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

     I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Oyster Bay, New York
        August 26, 2009

                      CHALOS & CO, P.C.
                      Attorneys for Plaintiff
                      Deiulemar Shipping SPA

          By:                         
                      George M. Chalos (GC-8693)
                      123 South Street
                      Oyster Bay, New York 11771
                      Tel: (516) 714-4300
                      Fax: (866) 702-4577
                      Email: gmc@chaloslaw.com